# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| CYPRESS LAKE SOFTWARE, INC., | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Case No. 6:17-CV-00300-RWS (LEAD) |
| ZTE (USA) INC., | § § | |
| *Defendant.* | § § § | |

## MEMORANDUM OPINION AND ORDER ON CLAIM CONSTRUCTION

On August 8, 2018, the Court held a hearing to determine the proper construction of the disputed claim terms in United States Patent Nos. 8,661,361 ("the '361 Patent"), 8,781,299 ("the '299 Patent"), 8,983,264 ("the '264 Patent"), 9,871,558 ("the '558 Patent"), and 9,423,954 ("the '954 Patent"). The Court has considered the arguments made by the parties at the hearing and in their claim construction briefs. Docket Nos. 93, 98, & 121.[1] The Court has also considered the intrinsic evidence and made subsidiary factual findings about the extrinsic evidence. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The Court issues this Memorandum and Order on Claim Construction in light of these considerations.

---

[1] Citations to the parties' filings are to the filing's number in the docket (Docket No.) and pin cites are to the page numbers assigned through ECF.

# TABLE OF CONTENTS

I.    BACKGROUND ................................................................................................. 3

II.   APPLICABLE LAW ........................................................................................... 6

III.  LEVEL OF ORDINARY SKILL IN THE ART ............................................. 11

IV.   CONSTRUCTION OF AGREED TERMS ..................................................... 12

V.    CONSTRUCTION OF DISPUTED TERMS .................................................. 13

      A.   The Disputed "Code For" Terms In The '361 Patent.......................... 13

      B.   The Disputed "Component" Terms In The '361 Patent...................... 22

      C.   The Disputed "Code For" Terms In The '299 And '264 Patent ........ 33

      D.   "allowed"............................................................................................. 43

      E.   "application region" ........................................................................... 47

      F.   "a second application region" ............................................................ 50

      G.   "application"........................................................................................ 53

      H.   "operating application(s)" .................................................................. 56

      I.   "detection of a first (second/third) user input"................................ 58

      J.   The "Instructions To" Phrase In The '361 Patent ............................ 61

VI.   CONCLUSION.................................................................................................. 67

## I.  BACKGROUND

### A.  The '361 Patent

The '361 Patent is titled "Methods, Systems, and Computer Program Products for Navigating Between Visual Components."  The '361 Patent generally relates to navigating between different applications whose windows are simultaneously displayed on a computer screen. '361 Patent at 1:38–51.  The specification states that having multiple applications running and displayed at the same time creates a cluttered screen of overlapping windows.  *Id.* at 1:7–26. Thus, when multiple applications are simultaneously displayed in an overlapping manner, finding the desired application "may require a user to repeat a similar and/or same set of movements over and over."  *Id.*  According to the specification, the disclosed embodiments provide a solution to the need "for navigating between visual components."  *Id.*

Claim 1 of the '361 Patent is an exemplary claim and recites the following elements (disputed term in italics):

> 17. A system for navigating between visual components, the system comprising:
> a processor that executes an instruction included in at least one of a presentation space monitor component, an application navigator component, a *navigation element handler component*, and a *navigation director component* during operation of the system;
> the presentation space monitor component that during operation of the system detects, in a first *application region* of a presentation space of a display device, a first visual component of a first *operating application* in a plurality of *operating applications*;
> the application navigator component that during operation of the system presents a first navigation control, in a first navigation region determined based on the first *application region*, for navigating to a second visual component, of a second application in the plurality, in a second *application region* in the presentation space, wherein the first navigation region is determined based on a location of at least one of the first visual component, a parent visual

component of the first visual component, and a child visual
component of the first visual component;

the *navigation element handler component that* during operation
of the system *detects a user input corresponding to the first
navigation control*; and

the *navigation director component that* during operation of the
system *sends, in response to detecting the user input,
navigation information to navigate to the second visual
component.*

## B. The '299, '264, And '558 Patents

The '299 Patent, the '264 Patent, and the '558 Patent are all titled "Methods, Systems, and

Computer Program Products for Coordinating Playing of Media Streams." These patents share a

common specification. The specification states that the disclosed embodiments address a problem

that occurs when multiple media streams play simultaneously, thereby creating "interference" and

"lead[ing] to an unpleasant listening experience." '299 Patent at 1:20–43. The specification adds

that a need exists for coordinating playing of media streams. *Id.* To achieve this coordination, the

patents use "presentation focus," which indicates that a first media player is allowed to play a first

media stream, and a second media player is not allowed to play a second media stream. *See e.g.,*

*id.* at 12:60–13:8.

Claim 1 of the '299 Patent is an exemplary claim and recites the following elements

(disputed term in italics):

1. A computer program product embodied on a non-transitory
computer readable medium, comprising:

*code for working in association with a first presentation device
having a touchscreen that is capable of providing access to
a plurality of applications including a first media player
and a second media player in an execution environment, the
first presentation device capable of communication with a
second presentation device including a display via a
wireless local area network on which the first presentation
device resides, where execution environment presentation
focus information is accessible for identifying whether at
least one of the first presentation device or the second*

presentation device is to be utilized for presentation in connection with the applications;

code for detecting access to the first media player to play a first media stream that includes video;

*code for indicating*, if the first presentation device is to be utilized for presentation based on the execution environment presentation focus information, *that the first media player is allowed to play the first media stream via the first presentation device*;

*code for indicating*, if the second presentation device is to be utilized for presentation based on the execution environment presentation focus information, *that the first media player is allowed to play the first media stream via the second presentation device*;

code for indicating, if both the first presentation device and the second presentation device are to be utilized for presentation based on the execution environment presentation focus information, that the first media player is *allowed* to play the first media stream via both the first presentation device and the second presentation device;

wherein the computer program product is operable such that a change in presentation focus is capable of being based on at least one of a releasing of a first presentation focus in connection with the first media player, a detected user input indication for giving the second media player second presentation focus, a change in input focus, a change in an attribute of a user interface element, a count of media streams being played, a ranking of media streams being played, a transparency level of at least one of the user interface element, or another user interface element sharing a region of a display of the first presentation device.

## C. The '954 Patent

The '954 Patent is titled "Graphical User Interface Methods, Systems, and Computer Program Products." The '954 Patent generally relates to the integration of applications that run simultaneously on a computer. '954 Patent at 1:20–37. Claim 14 is the only asserted claim and recites the following elements (disputed term in italics):

14. An apparatus, comprising:
at least one processor configured for coupling with memory and a touchscreen, and further configured for:

storage of a plurality of *applications* including a first *application*, a second *application*, and a third *application*, utilizing the memory, the applications including a first program component and a second program component;

*detection of a first user input*;

in response to the first user input, presentation of, utilizing the touchscreen, a first window associated with the first program component including at least one user interface element;

*detection of a second user input* in connection with the at least one user interface element of the first window;

in response to the second user input in connection with the at least one user interface element of the first window, creation of a second window associated with the second program component and presentation thereof, utilizing the touchscreen, adjacent to and not overlapping with respect to the first window, for presenting, in the second window, data associated with the at least one user interface element of the first window;

*detection of a third user input*; and

in response to the third user input, change, utilizing the touchscreen, the presentation of the first window and the second window, such that a first size of the first window and a second size of the second window are both changed, and the second window remains adjacent to and not overlapping with respect to the first window.

## II.     APPLICABLE LAW

### A.     Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To determine the meaning of the claims, courts start by considering the intrinsic evidence.  *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  The intrinsic evidence includes the claims themselves, the specification, and the prosecution history.  *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at

861.  The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent.  *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry. . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)).  First, a term's context in the asserted claim can be instructive.  *Phillips*, 415 F.3d at 1314.  Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent.  *Id.* Differences among the claim terms can also assist in understanding a term's meaning.  *Id.*  For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  But, " '[a]lthough the specification may aid the court

in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.' " *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is " 'less significant than the intrinsic record in determining the legally operative meaning of claim language.' " *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the

particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court recently explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

## B.      35 U.S.C. § 112(6) (pre-AIA) / § 112(f) (AIA)[2]

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112, ¶ 6; *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in relevant portion). Section 112, Paragraph 6, provides that a structure may be claimed as a "means . . . for performing a specified function" and that an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002).

But § 112, ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112, ¶ 6 applies when the claim language includes "means" or "step for" terms, and that it does not apply in the absence of those terms. *Masco Corp.*, 303 F.3d at 1326;

---

[2] Because the application resulting in the '361 Patent w a s filed before September 16, 2012, the effective date of the America Invents Act ("AIA"), the Court refers to the  pre-AIA version of § 112.

*Williamson*, 792 F.3d at 1348. The presumption stands or falls according to whether one of ordinary skill in the art would understand the claim with the functional language, in the context of the entire specification, to denote sufficiently definite structure or acts for performing the function. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (§ 112, ¶ 6 does not apply when "the claim language, read in light of the specification, recites sufficiently definite structure" (quotation marks omitted) (citing *Williamson*, 792 F.3d at 1349; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014))); *Williamson*, 792 F.3d at 1349 (§ 112, ¶ 6 does not apply when "the words of the claim are understood by persons of ordinary skill in the art to have sufficiently definite meaning as the name for structure"); *Masco Corp.*, 303 F.3d at 1326 (§ 112, ¶ 6 does not apply when the claim includes an "act" corresponding to "how the function is performed"); *Personalized Media Communications, L.L.C. v. International Trade Commission*, 161 F.3d 696, 704 (Fed. Cir. 1998) (§ 112, ¶ 6 does not apply when the claim includes "sufficient structure, material, or acts within the claim itself to perform entirely the recited function . . . even if the claim uses the term 'means.'") (quotation marks and citation omitted).

When it applies, § 112, ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347. Construing a means-plus-function limitation involves multiple steps. "The first step . . . is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "[T]he next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* The focus of the "corresponding structure"

inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.* The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). However, § 112, ¶ 6 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

For § 112, ¶ 6 limitations implemented by a programmed general purpose computer or microprocessor, the corresponding structure described in the patent specification must include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). The corresponding structure is not a general purpose computer but rather the special computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### III.    LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art. *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). The Federal Circuit has advised that the "[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Envtl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors

are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

Plaintiff contends that "[a] person of ordinary skill in the art would have a Bachelor of Science degree in computer science with 2 years of programming experience, or the equivalent thereof." Docket No. 93 at 5. Defendant's expert, Dr. Dan Schonfeld, opines that a person of ordinary skill in the art "would have (a) at least at least a Bachelor's degree in Electrical Engineering, Computer Engineering, Computer Science, or equivalent thereof and (b) at least two years of work experience relating to multimedia streaming and user interfaces." Docket No. 102-1 at ¶15).

Having considered the parties' proposals, and the factors that may be considered in determining the level of skill in the art, the Court finds that a person of ordinary skill in the art would have a Bachelor's degree in Electrical Engineering, Computer Engineering, Computer Science, or equivalent thereof, and at least two years of programming experience.

## IV.  CONSTRUCTION OF AGREED TERMS

The parties agreed to the construction of the following terms/phrases:

| Claim Term/Phrase | Agreed Construction |
| --- | --- |
| "presentation focus information"<br><br>('299 Patent claims 1, 17, and 28; '264 Patent claim 61; '558 Patent claim 14) | "data that identifies one or more media players and whether the media players have presentation focus" |
| "presentation focus"<br><br>('299 Patent claims 1, 17, and 28; '264 Patent claims 61, 63, and 67; '558 Patent claim 14) | "an attribute associated with a media player, directly and/or indirectly, indicating whether the media player is allowed to access one or more presentation devices for playing one or more corresponding media streams on the presentation devices; an attribute for restricting and coordinating access to an output device by one or more applications" |

| "input focus"<br><br>('299 Patent claims 1, 17, and 28; '264 Patent claim 61; '558 Patent claim 14) | "an attribute of a user interface element indicating whether input from one or more particular input devices is directed to the element" |
| --- | --- |
| "navigation control"<br><br>('361 Patent claims 17, 50, 79, 97-99, 158, 159, 163) | "a user interface element for navigating between and/or among user interface elements of respective operating applications" |

Docket No. 111-1 at 26, 27, and 29. In view of the parties' agreement on the construction of the identified terms, the Court **ADOPTS** the parties' agreed constructions.

## V. CONSTRUCTION OF DISPUTED TERMS

The parties' dispute focuses on the meaning and scope of thirteen terms/phrases in the Asserted Patents.

### A. The Disputed "Code For" Terms In The '361 Patent

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
| --- | --- | --- |
| "code for detecting the user input corresponding to the first navigation control" | Not subject to § 112, ¶ 6. (plain and ordinary meaning) The entire specification and patents incorporated by reference. | Subject to § 112, ¶ 6. **Function:** "detecting user input corresponding to the first navigation control" **Structure:** none |
| "code for sending, in response to detecting the user input, navigation information to navigate to the second visual component" | Not subject to § 112, ¶ 6. (plain and ordinary meaning) The entire specification and patents incorporated by reference. | Subject to § 112, ¶ 6. **Function:** "sending, in response to detecting the user input, navigation information to navigate to the second visual component" **Structure:** none |

### 1. The Parties' Positions

The parties dispute whether the phrases "code for detecting . . ." and "code for sending . . ." are subject to § 112, ¶ 6. Plaintiff argues that the Court should find that § 112, ¶ 6 is not applicable. Docket No. 93 at 31. Defendant responds that both limitations are "drafted in the

same format as a traditional means-plus-function limitation" where the patentee "merely replace[d] the term 'means' " with the term "code." Docket No. 98 at 9 (citing *Williamson*, 792 F.3d at 1350). Defendant argues that the words "code for" do not convey any definite structure. Docket No. 98 at 10 (citing Docket No. 102-1 at ¶¶ 22-24, 32-33; Docket No. 98-3 at 6; Docket No. 98-4 at 4; Docket No. 98-5 at 4). Defendant further argues that the rest of the claim language also fails to provide any structural meaning in that it fails to distinguish "code for" from generic software. Docket No. 98 at 10 (citing Docket No. 102-1 at ¶¶ 24, 33). Defendant also contends that the specification of the '361 Patent equates "code for" and "means for." Docket No. 98 at 10-11 (citing '361 Patent at 14:14–7, 15:49–52). According to Defendant, the term "code for" invokes Section § 112, ¶ 6. Docket No. 98 at 11.

Defendant next argues that the '361 Patent does not disclose any algorithm or structure to perform the recited functions. *Id.* at 12 (citing Docket No. 102-1 at ¶¶ 26, 28-31, 35, 37-38; '361 Patent at 1:47–51, 14:43–46, 14:59–62, Figure 2). Defendant contends that the specification never associates the recited functions with any structure that would be understood by a POSITA. Docket No. 98 at 12 (citing Docket No. 102-1 at ¶¶ 28-31, 37-38). According to Defendant, claims 50, 79, 97-99, 158-159, and 163 are invalid as indefinite because the specification provides "just a black box . . . without any mention of a corresponding structure." Docket No. 98 at 13 (citing *ePlus, Inc. v. Lawson Software, Inc.,* 700 F.3d 509, 518 (Fed. Cir. 2012)).

Regarding the phrase "code for detecting," Plaintiff replies that Defendant's expert "ignores the '299 patent at least at Col. 6:21-38 which provides adequate structure in prose when it references Figure 2." Docket No. 121 at 14 (citing '299 Patent at 6:21–38). Plaintiff also argues that the patent specification of the '299 Patent provides additional examples in Figure 3. *Id.* According to Plaintiff, the Court should find that § 112, ¶ 6 is not applicable. Docket No. 121 at

15.

Regarding the phrase "code for sending," Plaintiff replies that Defendant's expert skips the step of starting with the context of the claim language. *Id.* Plaintiff further argues that the specification discloses structure. *Id.* ('361 at 15:52–16:5, Figure 2, 3, 4a-d). According to Plaintiff, the Court should find that § 112, ¶ 6 is not applicable. Docket No. 121 at 15.

For the following reasons, the Court finds that the phrase **"code for detecting the user input corresponding to the first navigation control"** is governed by 35 U.S.C. § 112, ¶ 6, and is indefinite. The Court further finds that the phrase **"code for sending, in response to detecting the user input, navigation information to navigate to the second visual component"** is governed by 35 U.S.C. § 112, ¶ 6, and is not indefinite.

### 2. Analysis

The phrase "code for detecting the user input corresponding to the first navigation control" appears in asserted claims 17, 50, 79, 97-99, 158, 159, and 163 of the '361 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "code for sending, in response to detecting the user input, navigation information to navigate to the second visual component" appears in asserted claims 17, 50, 79, 97-99, 158, 159, and 163 of the '361 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. For the following reasons, the Court finds that the phrases are subject to § 112, ¶ 6.

### a. Determining Whether the Disputed "Code For" Terms are Means-Plus-function Terms

It is well settled that [a] claim limitation that actually uses the word 'means' invokes a rebuttable presumption that § 112, [¶] 6 applies." *Apex Inc. v. Raritan Comput., Inc.*, 325 F.3d 1364, 1371 (Fed. Cir. 2003) (quotation omitted). It is also equally understood that "a claim term

that does not use 'means' will trigger the rebuttable presumption that § 112, [¶] 6 does not apply." *Id.* at 1371 (quotation omitted). The presumption against the application of § 112, ¶ 6 may be overcome if a party can "demonstrate[] that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Williamson*, 792 F.3d at 1348 (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)). "The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1349. In determining whether this presumption has been rebutted, the challenger must establish by a preponderance of the evidence that the claims are to be governed by § 112, ¶ 6. *See Apex Inc. v. Raritan Comput. Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003).

Here, there is a rebuttable presumption that § 112, ¶ 6 does not apply because the claim does not recite the word "means." Therefore, the analysis proceeds in two steps. First, the Court must determine whether the phrases are in means-plus-function form pursuant to 35 U.S.C. § 112, ¶ 6. *See Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1097 (Fed. Cir. 2014). If the Court determines that the phrase recites a means-plus-function limitation, then the Court proceeds to the next step and attempts "to construe the disputed claim term by identifying the corresponding structure, material, or acts described in the specification to which the term will be limited." *Id.* (internal quotation marks and citation omitted).

Starting with the first step, Defendant argues that the term "code for" does not convey any definite structure to a POSITA that could be used to perform the function. This Court has noted that in many instances, "code," like "circuit" or "processor," may connote sufficiently definite structure and is not a "nonce" or "functional" word that is subject to the limitations of § 112, ¶ 6. *Glob. Equity Mgmt. (SA) Pty. Ltd. v. Expedia, Inc.*, 2016 U.S. Dist. LEXIS 177218, at *96-97

(E.D. Tex. Dec. 22, 2016). In other words, whether recitation of a "code for" performing a function is governed by § 112, ¶ 6 depends on whether the recited objectives and operation of the code connote sufficiently definite structure. *See, e.g., Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1319-21 (Fed. Cir. 2004) (finding that "circuit [for performing a function]" was sufficiently definite structure because the claim recited the "objectives and operations" of the circuit.).

In the context of the intrinsic evidence, the Court agrees with Defendant that the term "code for" does not connote sufficiently definite structure. The term "code for" is defined only by the function that it performs. Specifically, "code for detecting the user input corresponding to the first navigation," or "code for sending . . . navigation information to navigate to the second visual component." The surrounding claim language also does not identify any specific structure of "code for" to perform the recited function of "detecting the user input corresponding to the first navigation control," or "sending . . . navigation information to navigate to the second visual component." Docket No. 102-1 at ¶¶ 24, 33.

Moreover, the specification equates "code for" and "means for" by using the same functional language as in the claims except that the specification recites "means for" performing those functions, whereas the claims recite "code for" doing so. Specifically, the specification states "a system for navigating between visual components includes ***means for*** *detecting a user input corresponding to the first navigation control*." '361 Patent at 14:14–17 (emphasis added). Likewise, the specification states "a system for navigating between visual components includes ***means for*** *sending, in response to detecting the user input, navigation information to navigate to the second visual component*." *Id*. at 15:49–52 (emphasis added). Thus, a person of ordinary skill in the art would understand that the '361 Patent uses the terms "code for" and "means for" as

synonyms. Docket No. 102-1 at ¶¶ 25, 34. Accordingly, Defendant has rebutted the presumption that § 112, ¶ 6 does not apply to the disputed "code for" terms in the '361 Patent.

Turning to Plaintiff's general arguments relating to the application of § 112, ¶ 6, Plaintiff first argues that reciting a "computer product embodied on a non-transitory computer readable medium" in the claims' preamble provides structure to perform functions associated with the "code for" terms. Docket No. 93 at 9. As discussed above, the Court reviewed the disputed phrases in the context of the claim language and intrinsic evidence and determines that Defendant has rebutted the presumption that § 112, ¶ 6 does not apply.

Plaintiff next argues that the terms discussed above are not means-plus-function limitations because they do not "mention [ ] the trigger term 'means for.' " Docket No. 93 at 15. As discussed above, the absence of the word "means" creates a rebuttable presumption, and Defendant has overcome the presumption by proving that the "claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Williamson,* 792 F.3d at 1348-49.

Plaintiff also argues that the patentee clearly indicated that § 112, ¶ 6 should not apply. Specifically, the patentee stated in the prosecution history that "it should be noted that no claims are intended to be construed under 35 U.S.C. paragraph 6." Docket No. 93 at 12-13. Whether a claim limitation invokes § 112, ¶ 6 is a question of law. Under the controlling precedent, the Court concludes that Defendant has rebutted the presumption that § 112, ¶ 6 does not apply. In other words, a patentee cannot "opt-out" of the controlling precedent by stating that his "intent" is for it not to apply.

Plaintiff also cites to a number of cases that were decided before the Federal Circuit's en banc *Williamson* holding that "a heightened burden [for applying Section 112(f)] is unjustified"

and "abandon[ing] characterizing as 'strong' the presumption that a limitation lacking the word 'means' is not subject to § 112, para. 6." *Williamson*, 792 F.3d at 1349. Contrary to *Williamson*, Plaintiff argues that "[t]he Federal Circuit has made it clear that 'the presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome.' " Docket No. 93 at 10 (citing *Roy-G-Biv Corp. v. Funac Ltd.*, Case 2:07-CV-418-DF (J. Folsom) (E.D. Tex. 2007) (citing *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004)). This is incorrect because the Federal Circuit has clarified that the very language quoted by Plaintiff is "superseded case law." *Media Rights*, 800 F.3d at 1373.

### b. Construing the Terms that are Subject to § 112, ¶ 6.

"The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic*, 248 F.3d at 1311. The Court finds that the recited function for the first term is "detecting the user input corresponding to the first navigation control." The Court finds that the recited function for the second term is "sending, in response to detecting the user input, navigation information to navigate to the second visual component." Having determined the function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Medtronic*, 248 F.3d at 1311.

When a limitation is a means-plus-function limitation, and the corresponding structure is software, there must be an algorithm for the software or else the means-plus-function limitation will be considered indefinite unless the function can be performed by a general purpose computer. *See Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013) (holding that the corresponding disclosure for a computer-implemented means-plus-function claim is an algorithm). An algorithm may be expressed "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (quoting *Finisar Corp. v. DirecTV Grp., Inc.*,

523 F.3d 1323, 1340 (Fed. Cir. 2008)). Even described "in prose," an algorithm is still "a step-by-step procedure for accomplishing a given result." *Id.* at 1385 (quoting *In re Freeman*, 573 F.2d 1237, 1245-46 (CCPA 1978)).

Regarding the phrase "code for detecting," the specification fails to disclose any structure for performing the recited function. There is no algorithm described in any form for the function of "detecting the user input corresponding to the first navigation control." Instead, the specification merely provides functional language and does not contain any process for detecting the user input.

Plaintiff does not identify any corresponding structure found in the specification of the '361 Patent. In its opening brief, Plaintiff only references "its arguments above pertaining to 112(6) not being applicable." Docket No. 93 at 31. The referenced arguments were for a different phrase, and did not identify any corresponding structure in the '361 Patent for this means-plus-function term. In its reply brief, Plaintiff cites to the '299 Patent. Docket No. 121 at 14. However, the asserted claims appear in the '361 Patent, not the '299 Patent. Moreover, the "structure" Plaintiff points to relates to the function of "detecting access to the first media player to play a first media stream that includes video," and not the function of "detecting the user input corresponding to the first navigation control" recited in the claims of the '361 Patent.

Plaintiff has not provided any support or reasoning for its proposal that the corresponding structure for a means-plus-function term can be found in an unrelated patent and correspond to an unrelated function. Contrary to Plaintiff's proposal, the structure "must be clearly linked or associated with the claimed function." *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir. 2003). The '299 Patent and the '361 Patent do not share a common specification, or share common elements. Thus, the structure linked to an unrelated function in an

unrelated patent cannot serve as a proxy for the required corresponding structure. Accordingly, Plaintiff has not identified any corresponding structure in the '361 Patent for the function of "detecting access to the first media player to play a first media stream that includes video."

Moreover, the specification of the '361 Patent does not disclose an algorithm or structure to perform the recited functions. During the claim construction hearing, Plaintiff argued that there are a number of figures in the '361 Patent that provide examples of structure. As it relates to the "code for detecting" term, these examples are generic black boxes devoid of any physical structure or algorithm. *See* '361 Patent at Figure 3 ("Navigation Element Handler 306"), Figure 4a ("Navigation Element Handler 406a"), Figure 4b ("Navigation Element Handler 406b), Figure 4c ("Navigation Element Handler 406c"), Figure 4d ("Navigation Element Handler 406d"). Likewise, the "algorithm" disclosed in Figure 2 only repeats the functional language recited in the claims. *See* '361 Patent at Figure 2 (Box 206 - "Detect a user input corresponding to the first navigation control"). "Merely restating the function in the specification is insufficient to provide the required algorithm." *Cloud Farm Assocs. LP v. Volkswagen Grp., Inc.*, 674 F. App'x 1000, 1010-11 (Fed. Cir. 2017). Accordingly, "[t]here is no specific algorithm disclosed in prose, as a mathematical formula, in flow charts, or otherwise" in the '361 Patent for performing the functions associated with the "code for detecting . . .." *Function Media*, 708 F.3d at 1318. Thus, the "code for detecting" phrase is indefinite for failure to disclose corresponding structure.

Regarding the phrase "code for sending . . . navigation information . . . ," the specification does disclose corresponding structure for performing the recited function. Specifically, the specification states the following:

> *Sending the navigation information may include* sending the navigation information by invoking a function, a method, and/or a subroutine. *Sending the navigation information may include sending* the navigation information by sending a message via a network. The message may be sent asynchronously. The message,

in another aspect, may be included in a request/response exchange. *Sending the navigation information may include sending* the navigation information by sending data via an inter-process communication (IPC) including, for example, a message queue, a pipe, an interrupt, a semaphore, and/or a lock. *Sending the navigation information may include sending* the navigation information via a shared data area.

'361 Patent at 15:60–16:5 (emphasis added).  Defendant's expert, Dr. Schonfeld, opines that these are "additional functionality that may be included as part of the function."  Docket No. 102-1 at ¶ 35.  The Court disagrees and finds that the specification identifies these as one or more steps used to perform the recited function of "sending navigation information to navigate to the second visual component."  Finally, in reaching its conclusion, the Court has considered the extrinsic evidence submitted by the parties and gives it its proper weight in light of the intrinsic evidence.

### 3.  Court's Construction

In light of the evidence, the Court finds that the phrase" **"code for detecting the user input corresponding to the first navigation control"** is governed by 35 U.S.C. § 112, ¶ 6, and is indefinite for failure to disclose corresponding structure.

In light of the evidence, the Court finds that the phrase **"code for sending, in response to detecting the user input, navigation information to navigate to the second visual component"** is governed by 35 U.S.C. § 112, ¶ 6, and construes the phrase as follows:

**Function**: **Sending, in response to detecting the user input, navigation information to navigate to the second visual component.**

**Corresponding Structure**: **A processor programmed to perform one or more of the steps for sending navigation information disclosed in the '361 Patent at 15:60–16:5.**

### B.  The Disputed "Component" Terms In The '361 Patent

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "navigation element handler component that … detects a user input" | Not subject to § 112, ¶ 6. (plain and ordinary meaning) The entire specification and patents incorporated by reference. | Subject to § 112, ¶ 6. **Function:** "detect a user input" **Structure:** none |
| "navigation director component that … sends … navigation information" | Not subject to § 112, ¶ 6. (plain and ordinary meaning) The entire specification and patents incorporated by reference. | Subject to § 112, ¶ 6. **Function:** "send navigation information" **Structure:** none |

### 1. The Parties' Positions

The parties dispute whether the phrases "navigation element handler component . . ." and "navigation director component . . ." are subject to § 112, ¶ 6. Regarding the phrase "navigation element handler component," Plaintiff argues that the claim language, including the preamble, connotes sufficient structure such that a person of ordinary skill in the art understands the claim language as written. Docket No. 93 at 26-27. Plaintiff further argues that the specification supports its position that no construction is needed for this term. *Id.* at 27 (citing '361 Patent at 14:17–19, Figures 3, 4a-d). According to Plaintiff, Defendant has not overcome the presumption that this term should be construed as a mean-plus-function. Docket No. 93 at 27.

Regarding the phrase "navigation director component," Plaintiff argues that claim 17 indicates that the phrase is part of a "system for navigating between visual components." Docket No. 93 at 28. Plaintiff further argues that the claim language goes on to explain the duties of the "navigation director component." *Id.* at 29. Plaintiff also contends that the specification of the '361 Patent discusses the role of the navigation director component in text, figures, and diagrams. *Id.* (citing '361 Patent at 15:1–18:55, Figures 3, 4a-d). According to Plaintiff, Defendant has not overcome the presumption that this term should be construed as a mean-plus-function. Docket No. 93 at 31.

Regarding the phrase "navigation element handler component," Defendant responds that

the limitations is drafted "in a format as a traditional means-plus-function limitations." Docket No. 98 at 13 (citing *Williamson*, 792 F.3d at 1350). Defendant argues that the limitation replaces the term "means" with the term "component" and then recites a function performed by the "navigation element handler component." *Id.* According to Defendant, the claim language indicates that the "navigation element handler component" performs a function but does not recite any structure for performing that function. *Id.* at 14 (citing Docket No. 102-1 at ¶¶ 50-53).

Defendant also contends that terms such as "element" and "component" are "nonce words that reflect nothing more than verbal constructs that may be used in a claim in a manner that is tantamount to using the word 'means' because they typically do not connote sufficiently definite structure." *Id.* (citing *Williamson*, 792 F.3d at 1350). Defendant also argues that adding the functional modifiers "navigation" and "handler" fails to "impart structure into" the terms "element" and "component." Docket No. 98 at 14 (citing Docket No. 102-1 at ¶¶ 51-53). Defendant further argues that the '361 Patent specification never describes the "navigation element handler component" in structural terms, but instead identifies functions performed by the "navigation element handler component." Docket No. 98 at 16 (citing Docket No. 102-1 at ¶¶ 55-56; '361 Patent at 13:25–27, 14:17–19, 14:26–28, 14:37–38, Figure 3, 4). According to Defendant, the term "navigation element handler component" invokes § 112, ¶ 6. Docket No. 98 at 16.

Regarding the phrase "navigation director component," Defendant argues that the limitation replaces the term "means" with the term "component" and then recites a function performed by the "navigation director component." According to Defendant, the claim language indicates that the "navigation director component" performs a function but does not recite any structure for performing that function. Docket No. 98 at 17. (citing Docket No. 102-1 at ¶¶ 61-65).

Defendant also contends that the '361 Patent does not provide any structural guidance

regarding the "navigation director component." Docket No. 98 at 17. According to Defendant, the patent refers to the component only in terms of functionality rather than describing structure for performing those functions. *Id.* ('361 Patent at 16:29–32, 16:49, 18:10). Defendant argues that the "navigation director component" is a means-plus-function limitation because the specification "only describes the term's function and interaction with other parts in the system" without providing structure for performing that function. Docket No. 98 at 18 (citing *Media Rights*, 800 F.3d at 1373).

Defendant next argues that the specification fails to disclose any structure for performing the recited functions. Docket No. 98 at 18. According to Defendant, the patent depicts both "components" as black boxes, without providing any structural or algorithmic information about those boxes. *Id.* (citing '361 Patent at Figures. 3, 4a-d). Defendant contends that the specification simply repeats the claimed functions, or refers to additional functions that may be performed by the components. Docket No. 98 at 18 (citing '361 Patent at 13:50–54, 14:11–19; 14:25–26, 15:11–13, 15:42–45, 16:25–27, 16:62–65, 17:57–59, 15:52–55, 17:43–47, 13:25–27, 14:35–38, 14:53–55, 15:7–10, 16:27–30, 16:65–17:2, 17:26–27; 17:60–62, 19:48–53, 20:2–12, 16:13–15, 16:27–36, 16:46–50, 16:65–17:7, 17:32–42, 17:60–18:1, 18:5–15; Docket No. 102-1 at ¶¶ 57-60, 68-72.) Defendant argues that this type of functional claiming "is impermissible under the statute." Docket No. 98 at 18 (citing *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003)).

Regarding the phrase "navigation element handler component . . .," Plaintiff replies that Defendant has not overcome the presumption that § 112, ¶ 6 does not apply. Docket No. 121 at 13. Plaintiff argues that there are multiple structural terms between the appearance of "a navigation element handler component" as part of a system, and the later appearance of the term

in Claim 17 when it recites "the navigation element handler component that during operation of the system detects a user input corresponding to the first navigation control." *Id.* Plaintiff contends that Defendant overlooks all of the interrelated structural components that provides context to the meaning of the term "navigation element handler component." *Id.*

Regarding the phrase "navigation director component . . .," Plaintiff replies that Defendant has not overcome the presumption that § 112, ¶ 6 does not apply. *Id.* Plaintiff contends that there is no evidence that "means for" can be fungible with "navigation director component." *Id.* Plaintiff further argues that the specification provides sufficient structure. *Id.* (citing '361 Patent at 15:52–16:5).

For the following reasons, the Court finds that the phrase **"navigation element handler component that . . . detects a user input corresponding to the first navigation control"** is governed by 35 U.S.C. § 112, ¶ 6, and is indefinite. The Court further finds that the phrase **"navigation director component that . . . sends, in response to detecting the user input, navigation information to navigate to the second visual component"** is governed by 35 U.S.C. § 112, ¶ 6, and is not indefinite.

## 2. Analysis

The phrase "navigation element handler component that . . . detects a user input corresponding to the first navigation control" appears in asserted claim 17 of the '361 Patent. The phrase "navigation director component that . . . sends, in response to detecting the user input, navigation information to navigate to the second visual component" also appears in asserted claim 17 of the '361 Patent. For the following reasons, the Court finds that the phrases are subject to § 112, ¶ 6.

### a. Determining Whether the Disputed "Component" Terms are Means-Plus-Function Terms

Here, there is a rebuttable presumption that § 112, ¶ 6 does not apply because the claim does not recite the word "means." Therefore, the analysis proceeds in two steps.[3] Starting with the first step, Defendant argues that the phrases are is drafted "in a format consistent with traditional means-plus-function claim limitations." Docket No. 98 at 13 (citing *Williamson*, 792 F.3d at 1350). According to Defendant, the limitations replace the term "means" with the term "component," and then recite a function performed by each component. *Id.* The Court agrees that the terms "navigation element handler component . . ." and "navigation director component . . ." invoke the application of § 112, ¶ 6. Both phrases fail to describe a sufficient structure and otherwise recite abstract elements for performing functions.

The claim terms "navigation element handler component . . ." and "navigation director component . . ." by themselves, do not identify a structure by its function, nor do the asserted claims suggest that the phrases connote a definite structure. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (finding that the term "compliance mechanism" invokes § 112, ¶ 6, because the asserted claims "simply state that the 'compliance mechanism' can perform various functions"). Likewise, the functional modifiers "navigation," "element," "handler," and "director" fail to impart structure into the term "component." The ordinary meanings of these terms do not connote structure, and neither the specification nor the prosecution history gives these adjectives any structural significance in this claim. Instead, the "components" terms are coined for the purposes of the asserted patent. Indeed, the terms are not used in "common parlance or by persons of skill in the pertinent art to designate structure," such

---

[3] The applicable law relating to the determination and construction of means-plus-function terms is included in the Analysis Section of "The Disputed 'Code For' Terms in The '361 Patent."

that it connotes sufficient structure to avoid the application of 35 U.S.C. § 112, ¶ 6.  *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1359 (Fed. Cir. 2004), *overruled on other grounds by Williamson*, 792 F.3d at 1348-49.  Defendant's expert offers the unrebutted testimony that "navigation element handler component" and "navigation director component" are not terms that are used in common in the fields of computer science or electrical engineering.  Docket No. 102-1 at ¶¶ 51-52, ¶¶ 62-63.

To support its position, Plaintiff offers the unsupported assertion of its expert that the meaning of these terms are "sufficiently apparent."  Docket No. 93-1 at ¶¶ 22-24.  Plaintiff's expert fails to identify what that meaning would be to a POSITA or cite any evidentiary support.  In such cases, "an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court."  *P & RO Sols. Grp. v. CiM Maint., Inc.*, 273 F. Supp.3d 699, 703 (E.D. Tex. 2017).  More importantly, Plaintiff's expert does not opine that the terms "navigation element handler component" and "navigation director component," or the related claim language, describes sufficient structure to a person of ordinary skill in the art.

Moreover, the specification explicitly states that these components are "means for" examples, and uses the same functional language as in the claims except that the specification recites "means for" performing those functions whereas the claims recite the respective "component" doing so.  Specifically, the specification states "a system for navigating between visual components includes ***means for*** *detecting a user input corresponding to the first navigation control*.  For example, as illustrated in FIG. 3, ***navigation element handler component 306*** is configured *for detecting a user input corresponding to the first navigation control,*" '361 Patent at 14:14-19 (emphasis added).  Likewise, the specification states "a system for navigating between visual components includes ***means for*** *sending, in response to detecting the user input, navigation*

*information to navigate to the second visual component.* For example, as illustrated in FIG. 3, **navigation director component 308** is configured *for sending, in response to detecting the user input, navigation information to navigate to the second visual component.*" '361 Patent at 15:49-55 (emphasis added). Thus, a person of ordinary skill in the art would understand that the '361 Patent uses "component" as a synonym for "means for." Accordingly, Defendant has rebutted the presumption that § 112, ¶ 6 does not apply to the "component" terms.

Plaintiff argues that claim 17 indicates that the phrase is part of a "system for navigating between visual components." Docket No. 93 at 28. Plaintiff contends that there are multiple structural terms between the first appearance of the "component" terms as part of a system, and the later appearance of the terms in Claim 17. Like the disputed "component" terms, the other "multiple structural terms" that appear in claim 17 are coined for the purposes of the asserted patent. The terms are not used in "common parlance or by persons of skill in the pertinent art to designate structure," such that it connotes sufficient structure to avoid the application of 35 U.S.C. § 112, ¶ 6. Contrary to Plaintiff's contention, the claim language does not explain the duties of the "component" term, but instead merely recites functional language.[4] Accordingly, Defendant has rebutted the presumption that § 112, ¶ 6 does not apply to the "component" terms.

### b. Construing the Terms that are Subject to § 112, ¶ 6.

"The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic*, 248 F.3d at 1311. The Court finds that the recited function for the first term is "detects a user input corresponding to the first navigation control." The Court finds that the recited function for the second term is "sends, in

---

[4] Plaintiff presented a number of general arguments regarding the application of § 112, ¶ 6 to all of the disputed means-plus-function term. The Court addressed these arguments in the Analysis Section of "The Disputed 'Code For' Terms In The '361 Patent."

response to detecting the user input, navigation information to navigate to the second visual component." Having determined the function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Medtronic*, 248 F.3d at 1311.

Regarding the phrase "navigation element handler component," the claims and the specification fail to disclose any structure for performing the recited function. There is no algorithm or structure described in any form for the recited function. The specification merely provides functional language and does not contain any process for detecting "a user input corresponding to the first navigation control." Furthermore, the specification of the '361 Patent does not describe the "navigation element handler component" in structural terms. Rather, the specification identifies functions performed by the "navigation element handler component." In fact, as discussed above, the specification equates the term "navigation element handler component" to "means for."

Plaintiff contends that the specification supports its position that no construction is needed for this term. Docket No. 93 at 27 (citing '361 Patent at 14:17–19, Figures 3, 4a-d). As it relates to the term "navigation element handler component," the "structure" cited by Plaintiff is a generic black box devoid of any physical structure or algorithm:



'361 Patent at Figure 3 (highlighted). Figures 4a-d, do not provide any additional structure, but instead rearrange the boxes of Figure 3. Figure 4a is shown below as one example:



'361 Patent at Figure 4a (highlighted). Likewise, the "algorithm" disclosed in Figure 2 only repeats the functional language recited in the claims. *See* '361 Patent at Figure 2 (Box 206 - "Detect a user input corresponding to the first navigation control"). "Merely restating the function in the specification is insufficient to provide the required algorithm." *Cloud Farm Assocs. LP v. Volkswagen Grp., Inc.*, 674 F. App'x 1000, 1010-11 (Fed. Cir. 2017).

The rest of the specification makes no reference to any structure. The specification only provides functional language and does not contain any step-by-step process or other indication of structure. The recited functions must be performed by some component disclosed in the specification; however, the specification does not describe these components. "While it is true that the patentee need not disclose details of structures well known in the art, . . . the specification must nonetheless disclose *some* structure." *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005) (emphasis added). Accordingly, "[t]here is no specific algorithm disclosed in prose, as a mathematical formula, in flow charts, or otherwise" in the '361 Patent for performing the functions associated with the "navigation element handler component" limitation. *Function Media*, 708 F.3d at 1318. Thus, the "navigation element handler component" term is indefinite for failure to disclose corresponding structure.

Regarding the phrase "navigation director component that . . . sends, in response to detecting the user input, navigation information to navigate to the second visual component," the specification does disclose corresponding structure for performing the recited function. Specifically, the specification states the following:

> *Sending the navigation information may includ*e sending the navigation information by invoking a function, a method, and/or a subroutine. *Sending the navigation information may include sending* the navigation information by sending a message via a network. The message may be sent asynchronously. The message, in another aspect, may be included in a request/response exchange. *Sending the navigation information may include sending* the navigation information by sending

data via an inter-process communication (IPC) including, for example, a message queue, a pipe, an interrupt, a semaphore, and/or a lock. *Sending the navigation information may include sending* the navigation information via a shared data area.

'361 Patent at 15:60–16:5 (emphasis added). Defendant's expert, Dr. Schonfeld, opines that these are "further functionality." Docket No. 102-1 at ¶ 70. The Court disagrees and finds that the specification identifies these as one or more steps used to perform the recited function of sending "in response to detecting the user input, navigation information to navigate to the second visual component." Finally, in reaching its conclusion, the Court has considered the extrinsic evidence submitted by the parties and gives it its proper weight in light of the intrinsic evidence.

### 3. Court's Construction

In light of the evidence, the Court finds that the phrase **"navigation element handler component that . . . detects a user input corresponding to the first navigation control"** is governed by 35 U.S.C. § 112, ¶ 6, and is indefinite for failure to disclose corresponding structure.

In light of the evidence, the Court finds that the phrase **"navigation director component that . . . sends, in response to detecting the user input, navigation information to navigate to the second visual component"** is governed by 35 U.S.C. § 112, ¶ 6, and construes the phrase as follows:

**Function**: **Sends, in response to detecting the user input, navigation information to navigate to the second visual component.**

**Corresponding Structure**: **A processor programmed to perform one or more of the steps for sending navigation information disclosed in the '361 Patent at 15:60–16:5.**

### C. The Disputed "Code For" Terms In The '299 And '264 Patent

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "code for indicating . . . that [a] media player is allowed to play [a] media stream via [a presentation device]" | Not subject to § 112, ¶ 6. (plain and ordinary meaning) | Subject to § 112, ¶ 6.<br>**Function:** "indicating . . . that [a] media player is allowed to play [a] media stream via [a] presentation device."<br>**Structure:** '299 patent at 13:55-14:21, 22:58-23:4, 25:20-27 |
| "code for working in association with a first presentation device having a touchscreen that is capable of providing access to a first media player and a second media player in an execution environment, the first presentation device capable of communication with a second presentation device including a display via a wireless network on which the first presentation device resides, where [execution environment] presentation focus information is accessible for identifying whether at least one of the first presentation device or the second presentation device is to be utilized for presentation in connection with the applications" | Not subject to § 112, ¶ 6. (plain and ordinary meaning) | Subject to § 112, ¶ 6.<br>**Function:** "working in association with a first presentation device having a touchscreen that is capable of providing access to a first media player and a second media player in an execution environment, the first presentation device capable of communication with a second presentation device including a display via a wireless network on which the first presentation device resides, where [execution environment] presentation focus information is accessible for identifying whether at least one of the first presentation device or the second presentation device is to be utilized for presentation in connection with the applications"<br>**Structure:** none |

## 1. The Parties' Positions

The parties dispute whether the phrases "code for indicating . . . " and "code for working . . . " are subject to § 112, ¶ 6. Regarding the term "code for working," Plaintiff argues that the disputed phrase recites sufficient structure for performing the recited function. Docket No. 93 at 10. Plaintiff contends that in the parlance of software design, "code for …" sufficiently designates

structure. *Id.* Plaintiff further contends that Defendant has failed to overcome the presumption that the disputed terms are not means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6. *Id.* at 12. Plaintiff also argues that the patentee stated in the prosecution history that "no claims are intended to be construed under 35 U.S.C. 112, paragraph 6." *Id.* at 13 (citing Docket No. 93-11 at 23).

Regarding the term "code for indicating," Plaintiff argues that each patent family history indicates during the prosecution that it is not utilizing 112(6) in the claims. Docket No. 93 at 14 (citing Docket No. 93-11 at 51). Plaintiff also argues that the term is not just code, but specialized structure in the form of code of a computer program product embodied on a non-transitory computer readable medium. Docket No. 93 at 15. Plaintiff contends that since § 112, ¶ 6 does not apply, no further construction is required. *Id.*

Regarding the term "code for indicating," Defendant responds that these limitations are written in traditional means-plus-function format with the term "code for" replacing "means for" followed by recitation of a function. Docket No. 98 at 19. Defendant also argues that the term "code for" in the '299 Patent does not convey any definite structure to a POSITA. *Id.* (citing Docket No. 102-1 at ¶¶ 22-24, 106-109). Finally, Defendant contends that the '299 Patent equates the terms "code for" and "means for" as it associates those terms with the same functional language. Docket No. 98 at 19 (citing '299 Patent at 13:37–41, 22:48–52, 25:10–15). Assuming the term "code for" requires the application of § 112, ¶ 6, Defendant identifies the passages at 13:63–14:5, 22:58–23:4, and 25:20–27 of the '299 Patent as the algorithm for performing the recited function. Docket No. 98 at 19-20 (citing Docket No 102-1 at ¶ 111).

Regarding the term "code for working," Defendant responds that the term "code for" renders this language a means-plus-function limitation under § 112, ¶ 6. Docket No. 98 at 20

(citing Docket No. 102-1 at ¶¶ 94-97). Defendant argues that the '299 and '264 Patents are devoid of any structural disclosure for performing the recited function. Docket No. 98 at 20 (citing Docket No. 102-1 at ¶¶ 97-99). According to Defendant, the patent specification never discusses the recited functionality, much less discloses and links structure for performing the functionality. Docket No. 98 at 20.

Regarding the term "code for working," Plaintiff replies that the inventor made a clear disclaimer that he was not invoking § 112, ¶ 6. Docket No. 121 at 4 (citing Docket No. 98-11). Plaintiff contends that there is no indication § 112, ¶ 6 applies when reading the claims, specification, and prosecution. Docket No. 121 at 5. Plaintiff further contends that Defendant has failed to overcome the presumption that the disputed terms are not means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6. *Id.*

Regarding the term "code for indicating," Plaintiff replies that Defendant ignores the '299 specification at least at Col. 13:33-54, which provides structure for the term "code for indicating." *Id.* at 9 (citing '299 Patent at 13:42–46, 13:33–54). Plaintiff argues that Defendant also ignores the '299 Patent specification dealing specifically with blocks 452a-c in Figures 4a-c and 552 in Fig. 5, which it contends provide further structure for the term "code for indicating." Docket No. 121 at 9-10 (citing '299 Patent at 22:44–23:4, 25:7–27).

For the following reasons, the Court finds that the phrase **"code for indicating . . . that [a] media player is allowed to play [a] media stream via [a presentation device]"** is governed by 35 U.S.C. § 112, ¶ 6, and is not indefinite. The Court further finds that the phrase **"code for working in association with a first presentation device having a touchscreen that is capable of providing access to a first media player and a second media player in an execution environment, the first presentation device capable of communication with a second**

**presentation device including a display via a wireless network on which the first presentation device resides, where [execution environment] presentation focus information is accessible for identifying whether at least one of the first presentation device or the second presentation device is to be utilized for presentation in connection with the applications"** is not governed by 35 U.S.C. § 112, ¶ 6.

### 2. Analysis

The phrase "code for indicating . . ." appears in asserted claims 1, 17, and 26 of the '299 Patent, and asserted claim 61 of the '264 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "code for working . . ." appears in asserted claims 1, 17, and 26 of the '299 Patent, and asserted claim 61 of the '264 Patent. The Court finds that the phrases are used consistently in the claims and are intended to have the same general meaning in each claim.

#### a. Determining Whether the Disputed "Code For" Terms are Means-Plus-Function Terms

Here, there is a rebuttable presumption that § 112, ¶ 6 does not apply because the claim does not recite the word "means." Therefore, the analysis proceeds in two steps.[5] Starting with the first step, Defendant argues that the term "code for" does not convey any definite structure to a POSITA that could be used to perform the function. In this instance, the Court agrees with Defendant that the term "code for indicating," in the context of the asserted claims and intrinsic evidence, does not connote sufficiently definite structure. The term "code for" is defined only by the function that it performs. Specifically, "code for indicating . . . that [a] media player is allowed to play [a] media stream via [a presentation device]."

---

[5] The applicable law relating to the determination and construction of means-plus-function terms is included in the Analysis Section of "The Disputed 'Code For' Terms in The '361 Patent."

Moreover, the specification equates "code for" and "means for" by using the same functional language as in the claims except that the specification recites "means for" performing those functions whereas the claims recite "code for" doing so. Specifically, the specification repeatedly states "a system for coordinating playing of media streams includes *means for indicating, in response to determining the first media player has first presentation focus, that the first media player is allowed to play the first media stream via the first presentation device.*" 299 at 13:37–41, 22:48–52, 25:10–15 (emphasis added). Thus, a person of ordinary skill in the art would understand that the '299 Patent uses the terms "code for indicating" and "means for indicating" as synonyms. Accordingly, Defendant has rebutted the presumption that § 112, ¶ 6 does not apply to the "code for indicating" term. [6]

Regarding the term "code for working," the Court finds that Defendant has not rebutted the presumption that § 112, ¶ 6 does not apply, but instead has conflated the steps in the § 112, ¶ 6 analysis. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298-1299 (Fed. Cir. 2014) ("Requiring traditional physical structure in software limitations lacking the term means would result in all of these limitations being construed as means-plus-function limitations and subsequently being found indefinite."); *Zeroclick, LLC v. Apple Inc.,* 891 F.3d 1003, 1007-09 (Fed. Cir. 2018) (holding that the district court erred by effectively treating "program" and "user interface code" as nonce words and concluding in turn that the claims recited means-plus-function limitations.).

In contrast to the claims in *Williamson*, the claim language here does not describe broadly phrased high-level functions such as "receiving communications" or "coordinating the operation of the streaming data module." *Williamson*, 792 F.3d at 1344. Instead, the claims describe the

---

[6] Plaintiff presented a number of general arguments regarding the application of § 112, ¶ 6 to all of the disputed means-plus-function term. The Court addressed these arguments in the Analysis Section of "The Disputed 'Code For' Terms In The '361 Patent."

objectives and operations of the computer program product as "working in association with a first presentation device having a touchscreen that is capable of providing access to a plurality of applications including a first media player and a second media player in an execution environment, the first presentation device capable of communication with a second presentation device including a display via a wireless local area network on which the first presentation device resides, where execution environment presentation focus information is accessible for identifying whether at least one of the first presentation device or the second presentation device is to be utilized for presentation in connection with the applications."

The claims further describe the structural interactions among the "code for working" by reciting "wherein the computer program product is operable such that a change in presentation focus is capable of being based on at least one of a releasing of a first presentation focus in connection with the first media player, a detected user input indication for giving the second media player second presentation focus, a change in input focus, a change in an attribute of a user interface element, a count of media streams being played, a ranking of media streams being played, a transparency level of at least one of the user interface element, or another user interface element sharing a region of a display of the first presentation device."

Thus, a person of ordinary skill in the art would understand that the claim language recites sufficient structure, and that the term "code for working" is not used as a generic term or black box recitations of structure or abstractions. *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007-09 (Fed. Cir. 2018) ("[A] person of ordinary skill in the art could reasonably discern *from the claim language* that the words '*program*,' . . . and '*user interface code*,' . . . are used not as generic terms or black box recitations of structure or abstractions, but rather as specific references to conventional graphical user interface programs or code, existing in prior art at the time of the

inventions.") (emphasis added). Indeed, unlike the other "code for" terms, the specification of the '299 Patent does not use the term "code for working" as a synonym for "means for."

In summary, although the presumption against § 112 ¶ 6 is no longer "strong," it is still a presumption that Defendant must affirmatively overcome. In the context of this intrinsic record, the Court finds that Defendant has not shown that "code for working . . ." should be subject to § 112, ¶ 6. Accordingly, the Court rejects Defendant's argument that the "code for working . . ." is a means-plus-function term governed by § 112 ¶ 6, and finds that no further construction is required.

### b. Construing the Terms that are Subject to § 112, ¶ 6.

"The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic*, 248 F.3d at 1311. The Court finds that the recited function for the first term is "indicating that [a] media player is allowed to play [a] media stream via [a] presentation device." Having determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Medtronic*, 248 F.3d at 1311.

Regarding the phrase "code for indicating," the corresponding structure disclosed in the specification is as follows:

In various aspects, *a play and/or a no-play indication may be provided in different ways.* In one aspect, presentation access component 352 may call and/or otherwise instruct the first media player to change its mode of operation to play mode *to provide a play indication*. Similarly, presentation access component 352 may instruct the first media player to enter a mode other than play mode *in providing a no-play indication*.

In another aspect, presentation access component 352 may detect access by a first media player to the first presentation device by being included in and/or otherwise intercepting stream data sent from the first media player to the first presentation device. Presentation access component 352 may process the data for presentation as configured, and/or pass it along unprocessed for processing by the first presentation device and/or another component included in the process of presenting

the media stream, *thus indicating the first media player is allowed to play the first media stream*.

In yet another aspect, presentation access component 352 may include and/or otherwise make use of a serialization mechanism such as a semaphore or lock. Presentation access component 352 *may provide a play indication* by not blocking and/or by unblocking a thread of execution for presenting the first media stream on the first presentation device by the first media player. Alternatively or additionally, presentation access component 352 *may provide a play indication* by being included in and/or otherwise interoperating with a thread/process scheduler to put one or more threads for playing the first media stream in a run state. Sending a no-play indicator may analogously be performed and/or otherwise provided for by presentation access component 352 by causing one or more threads for playing the first media stream to be blocked from execution by processor 104.

*Providing a play indication may further include* sending and/or receiving a message via a network to and/or from, respectively, a remote node where either the node hosting presentation access component 352 or the remote node is operatively coupled to a presentation device for presenting a media stream. Presentation access component 352 may be adapted to operate in a client node, a server node, and/or an intermediary node such as a proxy server. *A no-play indicator may be provided similarly*.

'299 Patent at 13:55–14:30 (emphasis added). The specification further states the following:

In FIG. 4a, presentation access component 452a *may indicate a media player is allowed to play* a media stream by passing intercepted invocations and data to a driver for the targeted presentation devices. In FIG. 4b, presentation access component 452b *may indicate a media player is allowed to play* a media stream by passing intercepted data from media content handler 434 to media UI element handler 432b allowing access to the targeted presentation device(s). In FIG. 4c, presentation access component 452c *may indicate a media player is allowed to play* a media stream by passing intercepted data from media UI element handler 432c to GUI subsystem 420c, graphics subsystem 422c, audio subsystem 428c, and/or other presentation components allowing access to the targeted presentation device(s).

Alternatively or additionally, in FIG. 4a, FIG. 4b, and FIG. 4c, presentation access component 452 may receive a request for permission to access a presentation device. Presentation access component 452 *may block or allow* a requesting thread to run based on the determination by focus director component 456 as described above. In another aspect, presentation access component 452 may respond to a request for permission *providing a play or a no-play identifier* to the calling presentation subsystem component. The calling component may access or not access a corresponding presentation device based on the identifier.

'299 Patent at 22:58–23:4 (emphasis added). The specification also states the following:

In FIG. 5, presentation access component 552 *may indicate a media player is allowed to play* a media stream by passing intercepted invocations and data to media player UI element handler 532 for a presenting on a presentation device of a client node, such as use node 602. In FIG. 5, presentation access component 552 may indicate *a media player is allowed to play a media stream* by passing intercepted data from media streamer 534 to media UI element handler 532.

Alternatively or additionally, in FIG. 5, presentation access component 552 may receive a request for permission to access media player UI element handler 532, media streamer 534, and/or another component included in playing a media stream. Presentation access component 552 *may block or allow* a requesting thread to run based on the determination by focus director component 556 as described above. In another aspect, presentation access component 552 *may respond to a request for permission providing a play or a no-play return value and/or parameter value to the calling component*. The calling component may access or not access a corresponding presentation device based on the return value and/or parameter value.

'299 Patent at 25:20–40 (emphasis added).  Defendant's expert, Dr. Schonfeld, generally identifies these portions of the specification as the corresponding structure.  Docket No. 102-1 at ¶ 111.  However, the Court finds that Defendant's structure is incomplete for two of the identified portions of the specification.  Accordingly, the complete portions are identified above.  Finally, in reaching its conclusion, the Court has considered the extrinsic evidence submitted by the parties and gives it its proper weight in light of the intrinsic evidence.

### 3.  Court's Construction

In light of the evidence, the Court finds that the phrase" **"code for working in association with a first presentation device having a touchscreen that is capable of providing access to a first media player and a second media player in an execution environment, the first presentation device capable of communication with a second presentation device including a display via a wireless network on which the first presentation device resides, where [execution environment] presentation focus information is accessible for identifying whether at least one of the first presentation device or the second presentation device is to be utilized for presentation in connection with the applications"** is not governed by 35 U.S.C. § 112, ¶ 6,

and will be given its plain and ordinary meaning.

In light of the evidence, the Court finds that the phrase **"code for indicating . . . that [a] media player is allowed to play [a] media stream via [a presentation device]"** is governed by 35 U.S.C. § 112, ¶ 6, and construes the phrase as follows:

**Function**: **Indicating that [a] media player is allowed to play [a] media stream via [a] presentation device.**

**Corresponding Structure**: **A processor programmed to perform one or more of the steps for indicating that [a] media player is allowed to play [a] media stream via [a] presentation device disclosed in the '299 Patent at 13:55–14:30, 22:58–23:4, 25:20–40.**

### D. "allowed"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "allowed" | (plain and ordinary meaning) | "permitted" |

### 1. The Parties' Positions

The parties dispute whether "allowed" should be construed to mean "permitted," as Defendant contends. Plaintiff argues that the term "allowed" appears "in abundance in all of the patents that have the disputed phrase appearing in an asserted patent claim." Docket No. 93 at 6. Plaintiff also argues that the claim language for the disputed term "allowed" is dispositive, and that the term does not need any construction when read in the context of the claim. *Id.* (citing '299 Patent at claim 17, 63). According to Plaintiff, there is no need to replace the inventor's selected term "allowed" with Defendant's proposed construction "permitted." Docket No. 93 at 7.

Defendant responds that its construction is based on the fundamental objective of the '299 Patent, and the patent's teachings for allowing a media player to play a media stream only when it is given permission to do so. Docket No. 98 at 24 (citing '299 Patent at 1:20–31, 1:55–56, Abstract). Defendant argues that the '299 Patent achieves its objective of coordinating the playing

of media streams by using "presentation focus" to provide permission to play to a particular media player.  Docket No. 98 at 25 (citing '299 Patent at 9:46–47, 2:24–27, 2:37–42, 23:5–13, 25:29–37, 26:1–5).  Defendant also contends that the '299 Patent's description of "allowed" to mean "permitted" accords with the common definition of "allow."  Docket No. 98 at 26 (citing Docket No. 98-6 at 4).  Defendant further argues that there are at least two ordinary meanings of "allowed" that fit the context of the '299 Patent, and that the ordinary meaning of the term "allowed" does not resolve the parties' dispute.  Docket No. 98 at 26 (citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008)).

Plaintiff replies that Defendant's own dictionary definition for "allow" undermines its position when it points out the differences between the term "allow" and "permit."  Docket No. 121 at 4 (citing Docket No. 98-6).  Plaintiff argues that *Phillips* indicates the claim language as vetted and issued by the patent office is normally given its plain and ordinary meaning. Docket No. 121 at 4 (citing *Phillips*, 415 F.3d at 1312).

For the following reasons, the Court finds that the term **"allowed"** should be given its plain and ordinary meaning.

### 2.  Analysis

The term "allowed" appears in asserted claims 1, 17, 27, and 28 of the '299 Patent, and asserted claim 61 of the '264 Patent.  The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim.  The Court further finds that Defendant has not provided a persuasive reason for replacing "allowed" with "permitted." The term "allowed" is used significantly more than "permitted" in the asserted patents.  For example, Plaintiff notes that "allowed" appears over 68 times in the '299 Patent, 49 times in the '264 Patent, and 34 times in the '558 Patent. Docket No. 93 at 6.  In contrast, the term "permitted"

appears only once in each of the three patents, and the term "permission" only appears nine times in each patent. Docket No. 98 at 26 n.7.

More importantly, the disputed phrase "allowed" does not require construction when read in the context of the surrounding claim language. For example, claim 17 of the '299 Patent recites "code for indicating, if the first presentation device is to be utilized for presentation *based on the execution environment presentation focus information*, that the first media player is allowed to play the first media stream via the first presentation device; code for indicating, if the second presentation device is to be utilized for presentation *based on the execution environment presentation focus information*, that the first media player is allowed to play the first media stream via the second presentation device." '299 Patent at 31:3–11 (emphasis added). This claim language is not overly technical or confusing. The claim recites that the code indicates which presentation device is allowed to play the media stream based on the "presentation focus information."

The parties agree that "presentation focus information" means "data that identifies one or more media players and whether the media players have presentation focus." Docket No. 111-1 at 26-27. The parties further agree that "presentation focus" means "an attribute associated with a media player, directly and/or indirectly, indicating whether the media player is allowed to access one or more presentation devices for playing one or more corresponding media streams on the presentation devices; *an attribute for restricting and coordinating access to an output device by one or more applications*." Docket No. 111-1 at 27 (emphasis added). Thus, the claim language indicates that it is the "presentation focus information" that indicates permission to play the media. Thus, there is no reason to replace the patentees selected term "allowed" with Defendant's proposed "permitted." Accordingly, the Court finds that the term does not require construction,

because the claim language is unambiguous, and is easily understandable by a jury, and should be given its plain and ordinary meaning.

Defendant argues that the '299 Patent achieves its objective of coordinating the playing of media streams by using presentation focus to provide permission to play to a particular a media player. Defendant cites to the specification and argues that the '299 Patent "repeatedly explains that a media player may play a stream only if it has 'permission.' " Docket No. 98 at 25. As discussed above, the specification uses the term "allowed" far more often in disclosing how it achieves its objective. Moreover, the specification states that "[t]he method further includes determining, by the media player, *that the media player has presentation focus* indicating permission to play the media stream via the presentation device." '299 Patent at 2:24–27. Consistent with the claims, the specification states that it is the "presentation focus" that indicates "permission to play." *See, e.g.*, '299 Patent at 21: 43-45 ("[M]edia players are determined *to not have presentation focus* indicating they must be paused and/or otherwise prevented from playing.") (emphasis added).

Defendant also submits an extrinsic dictionary definition that defines "allow" to mean "to give permission to or for; permit." Docket No. 98 at 26 n.7. This extrinsic evidence does not change the analysis. As discussed, the '299 Patent achieves the claimed objectives by indicating which presentation device is "allowed to play" the media stream based on the "presentation focus information." Thus, the claim language recites that it is the "presentation focus information" that indicates permission to play the media. Defendant failed to consider the term "allowed" in the context of the surrounding claim language and failed to provide a persuasive reason to redraft the claims as it proposes. Finally, in reaching its conclusion, the Court has considered the extrinsic evidence submitted by the parties and gives it its proper weight in light of the intrinsic evidence.

### 3. Court's Construction

The term **"allowed"** will be given its **plain and ordinary meaning.**

### E. "application region"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "application region" <br><br> "first application region" | "a region in a presentation space that includes the visual component" | "an area on a display device that is defined by the boundary of the application window" |

### 1. The Parties' Positions

The parties dispute whether the "application region" must be "defined by the boundary of the application window," as Defendant proposes. Plaintiff argues that "application region" is a term that appears in the claim language and also in the specification. Docket No. 93 at 18 (quoting without citation: "a region in a presentation space that includes the visual component"). Plaintiff contends that the term "presentation space" that is used in the definition of "application region" also needs background. Docket 93 at 18 (citing '299 Patent at 8:1–12). Plaintiff also argues that it would be improper to limit the disputed term "application region" to "the area of a computer display" because it may be projected up on a wall or to another computer. Docket No. 93 at 18 (citing '361 Patent at 12:23–31, 13:21–32, 17:32–65, Figures 2, 4a, 4b, 4c, 5, 6a-e, 7).

Defendant argues that the claims themselves establish that an "application region" is a bounded area within a display space. Docket No. 98 at 28 (citing '361 Patent at 31:14–15). According to Defendant, the claims demonstrate that an "application region" must have boundaries, otherwise it would not be possible for a drop down menu to be "at least" partially in the application region. Docket No. 98 at 28. Defendant contends that Plaintiff's construction allows the "application region" to be unbounded, thereby making claim 97 illogical. *Id.*

Defendant further argues that the specification defines the boundaries of the "application region." *Id.* (citing '361 Patent at 13:64–14:4, 19:36–39). Defendant contends that in order for a

navigation region to (i) share a border with the application region, or (ii) be partially included in the application region, or (iii) be outside the application region, the claimed "application region" must be defined by boundaries as provided in its construction. Docket No. 98 at 29. Defendant argues that Plaintiff's construction entirely ignores an application region's boundaries. *Id.* Defendant also contends that Plaintiff's construction merely rearranges the words already found in the claim language, rendering various claim terms redundant and unnecessary. *Id.*

Plaintiff replies that the word "coextensive" does not appear in the specification. Docket No. 121 at 10. Plaintiff further contends that this limitation should not be added to the construction because there is no disclaimer. *Id.*

For the following reasons, the Court finds that the term **"application region"** should be construed to mean **"region in a presentation space that includes the visual component."** The Court further finds that the term **"presentation space"** should be construed to mean **"storage region allocated and/or otherwise provided for storing presentation information. For example, a screen of a display."**

### 2. Analysis

The term "application region" appears in asserted claims 17, 50, 79, 97-99, 158, 159, and 163 of the '361 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The Court further finds that the specification provides an explicit definition for the term "application region." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("[A]n inventor may choose to be his own lexicographer if he defines the specific terms used to describe the invention 'with reasonable clarity, deliberateness, and precision.'") (quoting *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994)). The specification states that "[i]n detecting and/or otherwise monitoring a visual

component, a PS monitor component 402 may identify a region in a presentation space that includes the visual component. The region is referred to herein as an 'application region'." '361 Patent at 12:24–27.

Defendant responds that Plaintiff's construction is based on "entirely different term-'presentation space.'" Docket No. 98 at 28. Defendant is correct that the term "presentation space" is included in the definition of "application region" provided in the specification. However, the specification also provides an explicit definition for the term "presentation space." The specification states that "[a]s used in this document, the term 'presentation space' refers to a storage region allocated and/or otherwise provided for storing presentation information . . ." '361 Patent at 10:5–8. The specification adds that a screen of a display is an example of presentation space, and that "[e]xemplary display devices include liquid crystal displays (LCDs), light emitting diode (LED) displays, and projectors." '361 Patent at 10:17–18; 5:17–19. Accordingly, the Court adopts the explicit definitions for "application region" and "presentation space" provided in the specification of the '361 Patent.

Defendant also argues that the claims indicate that an "application region" must have boundaries. Docket No. 98 at 28. According to Defendant, Plaintiff's construction allows the "application region" to be unbounded. *Id.* Defendant further argues that Figures 6b and 6c defines the boundaries of the "application region." Defendant is correct that Figures 6b and 6c illustrate an application region with boundaries, and further indicate that in these embodiments, the application region shares a border with a navigation region. However, these are only exemplary embodiments. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012) ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not

redefine words."). Moreover, the specification provides an explicit definition for the disputed term, which does not include the additional limitation Defendant proposes.

Defendant's construction also adds the term "application window," which only appears in dependent claims. Furthermore, the Court disagrees with Defendant's contention that the explicit definition leaves the application region unbounded. The claims and the construction require the "application region" to be a region in the "presentation space." Thus, the "application region" is bounded by the "presentation space."

### 3. Court's Construction

The term **"application region"** means **"region in a presentation space that includes the visual component."** The term **"presentation space"** means **"storage region allocated and/or otherwise provided for storing presentation information. For example, a screen of a display."**

### F. "a second application region"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "a second application region" | "a region in a presentation space that includes the visual component of the second application" It may be coextensive with the first application region. | "an application region that is not coextensive with the first application region" |

### 1. The Parties' Positions

The parties dispute whether the "second application region" may be "coextensive" with the first application region. Plaintiff argues that the figures shows two application regions overlapping. Docket No. 93 at 20 (citing '361 Patent at Figures 6b, 6c, 6d, and 6e). According to Plaintiff, second application region may be coextensive with the first application region. Docket No. 93 at 21. Plaintiff contends that this is consistent with its constructions for "application

region" and "first application region," and does not read out a preferred embodiment, like the one displayed in Figures 6a-e. *Id.*

Defendant responds that Plaintiff's construction would allow the first and second application region to be the same exact region. Docket No. 98 at 30. Defendant contends that the asserted claims require a "first application region" and a separate "second application region." *Id.* (citing '361 Patent at 23:29–39). According to Defendant, the limitation "second application region" identifies an area in the presentation space that does not extend over the same exact area occupied by the first application region, *i.e.*, the regions cannot be coextensive. Docket No. 98 at 31. Defendant argues that if the regions are coextensive, then the scope of the above-excerpted claim language is identical with or without the underlined limitations. *Id.*

Defendant also argues that the Figures 6a-6e all show a first application, 604-1, and a separate and distinct second application, 604-2. *Id.* Defendant contends that each application occupies an application region defined by the boundary of the application window. *Id.* According to Defendant, the specification consistently and repeatedly depicts the first and second application regions as not coextensive. *Id.* Defendant concedes that the first and second application regions may overlap, but argues that the claim language requires that the first and second applications regions cannot be coextensive such that the first and second application regions cover the exact same regions. *Id.*

Plaintiff replies that there is no "coextensive" limitation in the specification, and that the patent actually teaches away from it. Docket No. 121 at 11.

For the following reasons, the Court finds that the term **"a second application region"** should be construed to mean **"region in a presentation space that includes the visual component of the second application."**

## 2. Analysis

The term "second application region" appears in asserted claims 17, 50, 79, 97-99, 158, 159, and 163 of the '361 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. As discussed with the previous term, the specification provides an explicit definition for the term "application region." The specification states that "[i]n detecting and/or otherwise monitoring a visual component, a PS monitor component 402 may identify a region in a presentation space that includes the visual component. The region is referred to herein as an 'application region'." '361 Patent at 12:24–27. Thus, the "second application region" is "a region in a presentation space that includes the visual component of the second application."

Defendant contends that the construction should preclude the second application regions from being "coextensive" with the first application region. Docket No. 98 at 30. Plaintiff argues that Defendant's construction is improper because the specification illustrates two application regions overlapping. Docket No. 93 at 20. Defendant responds that it does not dispute that the first and second application regions may overlap. Docket No. 98 at 31. Instead, Defendant argues that "the first and second applications regions cannot be coextensive such that the first and second application regions cover the exact same regions." *Id.*

As Defendant concedes, the intrinsic record does not preclude the application regions from overlapping, and in fact, discloses a number of embodiments where the application regions do overlap. For example, Figure 6e illustrates the first application 604-1e overlapping second application 604-2e.



'361 Patent at Figure 6e (highlighted). In this embodiment, the first application almost completely overlaps the second application. Defendant has not provided a persuasive reason why the application regions cannot completely overlap. The claims recite two application regions, and to satisfy the claim language, there must be two application regions. However, this does not preclude the application regions from overlapping or extending "over the same exact area." The claim and intrinsic evidence only require a first application region associated with a first application, and a second application region associated with a second application.

### 3. Court's Construction

The term **"a second application region"** means **"region in a presentation space that includes the visual component of the second application."**

### G. "application"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "application" | "a software program that performs a specific function" | "software program that performs a specific function, such as word processors, database programs, web browsers, and image-editing programs, as contrasted with a utility or operating system" |

### 1. The Parties' Positions

The parties agree that an "application" is "a software program that performs a specific function." The parties dispute whether the construction should exclude "a utility or operating system" from the meaning of application. Plaintiff argues that its construction eliminates the confusing examples from the proposed construction. Docket No. 93 at 32. According to Plaintiff, the examples included in Defendant's construction are not supported by the claim language or the specification of any of the patents-in-suit. *Id.*

Defendant responds that its construction is consistent with the specification and dictionary definitions of "application." Docket No. 98 at 33. Defendant further argues that the term "application" cannot be any software that performs a specific function because the '954 Patent distinguishes "applications" from "operating systems," and provides the same examples of applications as set forth in its construction. *Id.* (citing '954 Patent at 1:23–25, 1:27–37, 8:25–36, 4:35–38, Figure 1). Defendant contends that its construction will aid the jury's understanding of how the '954 Patent uses the term "application." Docket No. 98 at 34.

Plaintiff replies that Defendant invites confusion to the fact finders as the term "application" is prevalent across all five patents. Docket No. 121 at 16. Plaintiff also argues that the inclusion of alleged "examples" is an improper attempt by Defendant to read in restrictions to the claim language that do not exist. *Id.* Plaintiff contends that "application" should be construed to have its "plain and ordinary meaning," or alternatively, be construed as "a software program

that performs a specific function." *Id.*

For the following reasons, the Court finds that the term **"application"** should be construed to mean **"a software program that performs a specific function. For example, a word processor, a database program, a web browser, or an image-editing program."**

### 2. Analysis

The term "application" appears in asserted claim 14 of the '954 Patent. The intrinsic evidence indicates that the patentee distinguished between "applications" and an "operating system." The specification states that "FIG. 1 illustrates execution environment 102 including operating system 120, one or more applications 122, and other program code and/or data components illustrated by other libraries and subsystems 124." '954 Patent at 4:35–38. As shown below, Figure 1 illustrates "applications 122" distinct from "operating system 120." To the extent that Plaintiff argues that "application" as used in claim 14 of the '954 Patent may include only the operating system, the Court rejects this argument.



'954 Patent at Figure 1 (highlighted). Furthermore, the specification provides examples of applications. The Background section describes the lack of "integration and/or cooperation between or among applications used at the same time by a user." '954 Patent at 1:23–25. The specification explains:

> For example, documents often include both text and media such as images from pictures, graphs, and drawings. *Word processors* provide rich feature sets for creating and editing text, but provide relatively weak or no features for creating and editing other forms of data. As a result, users work on text for a document in *a word processor, images in an image editor, and drawings using a drawing tool such as a computer aided design (CAD) tool.* Users spend significant time managing the user interfaces of *these various applications* in order to access the data desired in the application desired.

'954 Patent at 1:27–37 (emphasis added). In other examples, Figs. 4a and 4b illustrate web browser 403b as an equivalent to an application 403a. The patent explains that "FIG. 4a illustrates execution environment 401a *hosting application 403a,*" while "FIG. 4b illustrates execution environment 401b *hosting browser 403b.*" *Id.* at 8:25–28 (emphasis added). The Court finds that these examples will help clarify the term for the jury. Finally, in reaching its conclusion, the Court has considered the extrinsic evidence submitted by the parties and gives it its proper weight in light of the intrinsic evidence.

### 3. Court's Construction

The term **"application"** should be construed to mean **"a software program that performs a specific function. For example, a word processor, a database program, a web browser, or an image-editing program."**

## H. "operating application(s)"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "operating application(s)" | (plain and ordinary meaning) | "active (i.e. running) application" |

### 1. The Parties' Positions

The parties dispute whether "operating application(s)" should be construed to mean "active (i.e. running) application," as Defendant contends. Plaintiff argues that nothing is gained by replacing "operating application" with "active (i.e. running) application." Docket No. 93 at 24. Plaintiff contends that adopting Defendant's position would be an advisory opinion because the parties don't have an actual dispute. *Id.* Plaintiff also argues that there are other unasserted claims that have the same disputed term "operating application" or variations of the term "operating" such as "operable." *Id.* (citing '361 Patent at claims 69, 70, 71, 72, 73, 74, 82, 83, 84, 85). According to Plaintiff, the patentee is making a distinction between an operable computer program product and one that is not. Docket No. 93 at 25. Finally, Plaintiff contends that the specification states that more than one application can be operating at the same time. *Id.* (citing '361 Patent at 12:19–23, 1:57–58, 12:54–57).

Defendant responds that its construction follows directly from the patentee's stated objective of reducing "cluttered desktops on desktop, notebook, and handheld devices." Docket No. 98 at 32 (citing '361 Patent at 1:7–21, 1:38–42). Defendant argues that in order for these applications to "clutter" a desktop, the applications must necessarily be running (i.e., active). Docket No. 98 at 32. Defendant contends that the extrinsic evidence confirms its construction. *Id.* (citing Docket Nos. 98-9 at 2; 98-10 at 2). Defendant also argues that the terms "operating" and "operable" are different terms used in different contexts in different claims, and the construction of one does not affect the construction of the other. Docket No. 98 at 33.

Plaintiff replies that nothing is gained by replacing "operating application" with "active (i.e. running) application." Docket No. 121 at 12. Plaintiff also argues that the inclusion of the term "i.e." is confusing. *Id.* Plaintiff further contends that Defendant never states it does not understand the meaning of "operating" when read in the context of claim 17. *Id.*

For the following reasons, the Court finds that the term **"operating application(s)"** should be given its plain and ordinary meaning.

## 2. Analysis

The term "operating application(s)" appears in asserted claim 17 of the '361 Patent. The Court finds that the term should be given it plain and ordinary meaning because Defendant has not provided a persuasive reason for replacing "operating" with "active (i.e. running)." The only support for Defendant's construction is extrinsic dictionary definitions. Docket No. 98 at 32. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Phillips*, 415 F.3d at 1318.

Moreover, the intrinsic evidence cited by Defendant uses the term "operating," and not active. For example, the disclosed system addresses the stated issue by providing a system "for navigating between visual components" by "detecting . . . a first visual component of a first operating application in a plurality of operating applications." '361 Patent at 1:38-42. The claim language is not overly technical or confusing. Thus, the Court finds that the term does not require construction, because it is unambiguous, and is easily understandable by a jury, and should be given its plain and ordinary meaning. Moreover, the Court is not persuaded that it should redraft the claim to replace a term in the specification with one that is not, particularly when doing so would not provide any additional clarity. Finally, in reaching its conclusion, the Court has considered the extrinsic evidence submitted by the parties and gives it its proper weight in light of the intrinsic evidence.

## 3. Court's Construction

The term **"operating application(s)"** will be given its plain and ordinary meaning.

## I. "detection of a first (second/third) user input"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "detection of a first (second/third) user input" | (plain and ordinary meaning) | "detecting user activation of a touch screen input" |

### 1. The Parties' Positions

The parties dispute whether the recited "detections" must be from a user activating the recited touchscreen. Plaintiff argues that Defendant is attempting to read into the claim a limitation that the input must be from a touchscreen. Docket No. 93 at 32. Plaintiff contends that the specification supports its position that plain and ordinary meaning applies to these three additional disputed claim terms. *Id.* at 33.

Defendant replies that Plaintiff asserts that this limitation somehow does not require the input to be from a touchscreen. Docket No. 98 at 35. Defendant contends that Plaintiff's position would read out an express limitation of claim 14. *Id.* (citing '954 Patent at 27:45–63). According to Defendant, the claim language makes clear that "detection of a first (second/third) user input" requires a touchscreen input. Docket No. 98 at 35.

Plaintiff replies that the patentee knew how to include a touchscreen limitation and did so in other elements. Docket No. 121 at 16 (citing '954 Patent at claim 19). Plaintiff further contends that Defendant's construction violates the cannon of claim differentiation. Docket No. 121 at 17. According to Plaintiff, Defendant improperly glosses over the claim language in such a way that it is dangerous to the interpretation of non-asserted claims. *Id.* (citing '954 Patent at claims 1-20).

For the following reasons, the Court finds that the phrase **"detection of a first (second/third) user input"** should be given its plain and ordinary meaning.

### 2. Analysis

The phrase "detection of a first (second/third) user input" appears in asserted claim 14 of the '954 Patent. The intrinsic evidence indicates that the "detection of a user input" in claim 14 should not be limited to a "touch screen input." Claim 14 only recites that the "presentation" of

the respective window is by "utilizing the touchscreen," it does not recite that the "detection" is by "utilizing the touchscreen." The lack of the "touchscreen" language in the "detection" element is significant because the specification includes embodiments that explicitly state that both the "detection" and "presentation" are by "utilizing the touchscreen." For example, the specification states "*detecting, utilizing the touchscreen*, a first user input in connection with the first application interface element associated with the first application; in response to the first user input, *presenting, utilizing the touchscreen*, a first visual component for presenting first data associated with the first application." '954 Patent at 1:61–66 (emphasis added). Thus, the patentee knew how to claim "utilizing the touchscreen" for detecting, but choose not do so in claim 14.

The specification further states that the user may provide input via a mouse or a pointing device, and not just a touchscreen. '954 Patent at 11:9–11 ("A user may provide an input detected by the mouse."), *id.* at 23:39–42 ("[A] location of a visual component may be changed in response to a dragging and dropping operation detected by a pointing and/or touch input device."). Consistent with the "presentation" limitation in claim 14, the specification also indicates that the touch screen may be an output device. *Id.* at 5:22–24 ("In some embodiments, an input device may also include an output device. Examples include a phone, a joystick, and/or a touch screen."). Thus, including "a touchscreen" in claim 14 does not automatically imply that it must be for "detection." Indeed, here claim 14 only recites that the touchscreen is in connection with "presentation" (*i.e.*, acting as an output device). Accordingly, the Court rejects Defendant's construction because it would improperly read a limitation into the claim. Detection is not limited to a touch screen input.

### 3. Court's Construction

The phrase **"detection of a first (second/third) user input"** will be given its **plain and**

ordinary meaning.

### J. The "Instructions To" Phrase In The '361 Patent

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "Instructions to . . . cause a change in presentation focus, by: pausing the presentation of the first media stream via the first presentation device utilizing the first media player, and presenting a second media stream via the first presentation device utilizing the second media player" | Not subject to § 112, ¶ 6. (plain and ordinary meaning) | Subject to § 112, ¶ 6. **Function:** "detecting access to the first media player to play a first media stream that includes video" **Structure:** none |

#### 1. The Parties' Positions

The parties dispute whether the phrase "instruction to . . ." is subject to § 112, ¶ 6. Plaintiff argues that Defendant ignores the claim language that provides the physical structure for completing the "instructions." Docket No. 93 at 17. Plaintiff also contends that the recited presentation device with memory, touchscreen, and one or more processors to execute the instructions also provides sufficient structure. *Id.* Operating under the assumption that § 112, ¶ 6 does not apply, Plaintiff contends that no further construction is required. *Id.*

Defendant responds that the term "instructions to" does not convey any definite structure to a POSITA. Docket No. 98 at 20 (citing Docket No. 102-1 at ¶¶ 113-16). Defendant argues that instructions describe generic software rather than structure for performing the claimed functionality. Docket No. 98 at 20 (citing Docket No. 98-5 at 5; Docket No. 98-3 at 7). According to Defendant, "instructions to" serves as a generic placeholder for software without providing any structural detail as how the system will accomplish the recited function. Docket No. 98 at 21. Defendant further contends that a generic "processor to execute instructions" cannot supply the structure. *Id.* Defendant argues that Plaintiff failed to identify any corresponding algorithm in the

'558 Patent.  *Id.*  According to Defendant, claim 14 is invalid as indefinite. *Id.*

Plaintiff replies that claim 14 recites "instructions to" followed by various functions. Docket No. 121 at 8.  Plaintiff argues that Defendant's expert mischaracterizes the claim language by omitting the surrounding claim language, which recites the objective and operation of the "instructions."  *Id.*  Plaintiff argues that the claim language recites the "instructions" interaction with the other instructions and structures in the claim.  *Id.*  According to Plaintiff, Defendant "skips right over any analysis of the disputed claim term in the context of the claim language altogether." *Id.* at 9.

For the following reasons, the Court finds that the phrase **"Instructions to . . ."** is not governed by 35 U.S.C. § 112, ¶ 6, and should be given its plain and ordinary meaning.

### 2.  Analysis

The phrase "instructions to . . ." appears in asserted claim 14 of the '558 Patent.  The Court further finds that the phrase is not subject to § 112 ¶ 6.

#### a.  Determining Whether the "Instructions To" Phrase is a Means-Plus-Function Term

Here, there is a rebuttable presumption that § 112, ¶ 6 does not apply because the claim does not recite the word "means."  Therefore, the analysis proceeds in two steps.[7]  Starting with the first step, Defendant argues that the term "instruction to" does not convey any definite structure to a POSITA that could be used to perform the function.  Docket No. 102-1 at ¶¶ 22-24, 106-109. The Court disagrees and finds that Defendant has conflated the steps in the § 112, ¶ 6 analysis. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298-1299 (Fed. Cir. 2014) ("Requiring traditional physical structure in software limitations lacking the term means would result in all of these

_____

[7] The applicable law relating to the determination and construction of means-plus-function terms is included in the Analysis Section of "The Disputed 'Code For' Terms in The '361 Patent."

limitations being construed as means-plus-function limitations and subsequently being found indefinite."); *Zeroclick, LLC v. Apple Inc.,* 891 F.3d 1003, 1007-09 (Fed. Cir. 2018) (holding that the district court erred by effectively treating "program" and "user interface code" as nonce words and concluding in turn that the claims recited means-plus-function limitations.).

In contrast to the claims in *Williamson*, the claim language here does not describe broadly phrased high-level functions such as "receiving communications" or "coordinating the operation of the streaming data module." *Williamson,* 792 F.3d at 1344. Instead, the claim describes the objectives and operations of the processor programmed to execute the recited "instructions." In other words, the claim language provides a description of how the processor is specifically programmed to operate. For example, the processor is programmed to execute the *instructions to* "simultaneously present a first media player and a second media player, where the first media player is presented with at least one first input control and the second media player is presented with at least one second input control, the at least one first input control and the at least one second input control each including at least one of a play input control or a pause input control." The processor is also programmed to execute the *instructions to* "detect a selection of the at least one first input control presented with the first media player," and "in response to the detection of the selection of the at least one first input control presented with the first media player, present a first media stream via the first presentation device utilizing the first media player."

Claim 14 further recites that the processor is also programmed to execute the *instructions to* "detect, while the first media stream is being presented via the first presentation device utilizing the first media player, a selection of the at least one second input control presented with the second media player," and "in response to the detection of the selection of the at least one second input control presented with the second media player while the first media stream is being presented via

the first presentation device utilizing the first media player, cause a change in presentation focus, by: pausing the presentation of the first media stream via the first presentation device utilizing the first media player, and presenting a second media stream via the first presentation device utilizing the second media player." Claim 14 further describes the structural interactions of the "instructions to" and the first and second presentation device: "wherein the first presentation device is configured such that the change in presentation focus results from at least one of: a releasing of a first presentation focus in connection with the first media player, a detected user input indication for giving the second media player a second presentation focus, a change in input focus, a change in an attribute of a user interface element, a count of media streams being played, a ranking of media streams being played, a transparency level of at least one of the user interface element, or another user interface element sharing a region of a display of the first presentation device."

Thus, a person of ordinary skill in the art would understand that the claim language recites sufficient structure, and that the term "instructions to . . ." is not used as a generic term or black box recitations of structure or abstractions. *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007-09 (Fed. Cir. 2018) ("a person of ordinary skill in the art could reasonably discern *from the claim language* that the words '*program*,' . . . and '*user interface code*,' . . . are used not as generic terms or black box recitations of structure or abstractions, but rather as specific references to conventional graphical user interface programs or code, existing in prior art at the time of the inventions.") (emphasis added). By attempting to focus on one isolated aspect of the "instruction to," Defendant ignores the surrounding claim language and the context of the structure disclosed in the claim.

Defendant also contends that by associating the term with a variety of different functions, the claims demonstrate that term is a generic term rather than a definite structure for performing a

specific function. Docket No. 98 at 10. The Court disagrees. Requiring the patent to describe precisely how the claimed functions are achieved or how a person of ordinary skill in the art could make and use the invention goes beyond the threshold trigger for the application of § 112, ¶ 6. Defendant's argument here is more in the nature of enablement or disclosure of corresponding structure where it has already been determined that a term is a means-plus-function limitation, not the threshold question whether § 112 ¶ 6 applies in the first place. *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1336 (Fed. Cir. 2008) (in evaluating a claim that was a means-plus-function limitation, stating that "[w]hether the disclosure would enable one of ordinary skill in the art to make and use the invention is not at issue here"; "[e]nablement of a device requires only the disclosure of sufficient information so that a person of ordinary skill in the art could make and use the device" while "[a] section 112 paragraph 6 disclosure . . . serves the very different purpose of limiting the scope of the claim to the particular structure disclosed, together with equivalents").

It is true that when a limitation is a means-plus-function limitation, and the corresponding structure is software, there must be an algorithm for the software or else the means-plus-function limitation will be considered indefinite unless the function can be performed by a general purpose computer. *See Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013) (holding that the corresponding disclosure for a computer-implemented means-plus-function claim is an algorithm). But that authority is not on point because that definiteness analysis is triggered only where the limitation is a means-plus-function limitation.

In summary, although the presumption against § 112 ¶ 6 is no longer "strong," it is still a presumption that Defendant must affirmatively overcome. In the context of the intrinsic record for the '558 Patent, the Court finds that Defendant has not shown that "instructions to" should be

subject to § 112, ¶ 6. Accordingly, the Court reject Defendant's argument that the phrase "instructions to . . ." is a means-plus-function term governed by § 112, ¶ 6, and finds that no further construction is required. Finally, in reaching its conclusion, the Court has considered the extrinsic evidence submitted by the parties and gives it its proper weight in light of the intrinsic evidence.

### 3. Court's Construction

In light of the evidence, the Court finds that the phrase **"wherein the one or more processors execute the instructions to: simultaneously present a first media player and a second media player, where the first media player is presented with at least one first input control and the second media player is presented with at least one second input control, the at least one first input control and the at least one second input control each including at least one of a play input control or a pause input control; detect a selection of the at least one first input control presented with the first media player; in response to the detection of the selection of the at least one first input control presented with the first media player, present a first media stream via the first presentation device utilizing the first media player; detect, while the first media stream is being presented via the first presentation device utilizing the first media player, a selection of the at least one second input control presented with the second media player; in response to the detection of the selection of the at least one second input control presented with the second media player while the first media stream is being presented via the first presentation device utilizing the first media player, cause a change in presentation focus, by: pausing the presentation of the first media stream via the first presentation device utilizing the first media player, and presenting a second media stream via the first presentation device utilizing the second media player; wherein the first presentation device is configured such that the change in presentation focus results from at**

**least one of: a releasing of a first presentation focus in connection with the first media player, a detected user input indication for giving the second media player a second presentation focus, a change in input focus, a change in an attribute of a user interface element, a count of media streams being played, a ranking of media streams being played, a transparency level of at least one of the user interface element, or another user interface element sharing a region of a display of the first presentation device."** is not governed by 35 U.S.C. § 112, ¶ 6, and will be given its plain and ordinary meaning.

## VI. CONCLUSION

The Court adopts the constructions above for the disputed and agreed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 23rd day of August, 2018.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE